UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 3:18-cr-02658-BTM |
|---|---|
| v. | **ORDER GRANTING IN PART, DENYING IN PART MOTION TO SUPPRESS STATEMENTS** |
| KARL ROBERT HEUSNER, Defendant. | **[ECF No. 40]** |

Before the Court is the Defendant Karl Robert Heusner's motion to suppress statements.[1] (ECF No. 40; *see also* ECF No. 40-1, at 16-25.) The Court held an

---

[1] The Defendant's motion to suppress statements is a discrete part of a larger motion to dismiss the information and suppress evidence (the "Omnibus Motion"). (ECF No. 40; ECF No. 40-1, at 16-25.) At a status conference held on July 3, 2019, the Court held that the Omnibus Motion would be handled in stages, with the motion to suppress statements to be resolved first. (*See* ECF No. 45.) The remaining portions of the Omnibus Motion, namely the Defendant's motion to dismiss the information (ECF No. 40-1, at 26-33), motion to suppress tainted evidence (*id.* at 33), motion to suppress cell phone evidence obtained from invalid search warrants (*id.* at 34-46), motion to suppress cell phone evidence obtained from unlawful searches (*id.* at 46-49), motion to suppress evidence obtained from the Google search warrant (*id.* at 49-55), and motion for leave to file further motions (*id.* at 55), will be addressed in subsequent orders.

1

evidentiary hearing and heard oral argument on September 17 & 18, 2019.  For the reasons discussed below, the Defendant's motion is **GRANTED IN PART, DENIED IN PART**.

## I. BACKGROUND

On March 15, 2018, the La Mesa Police Department ("LMPD") sought and obtained a warrant (the "First Search Warrant") to search the Defendant's residence, vehicles, and person for evidence of possession of child pornography in violation of California Penal Code § 311.11.  (ECF No. 40-2, at 2-6, 20.)  At approximately 6:25 p.m. that same day, LMPD officers, led by Detective Michael Butcher, executed the First Search Warrant at the Defendant's residence as the Defendant, his wife, and her child were returning home in his wife's vehicle.  (*See id.* at 23, 30.)  At that time, the Defendant and his family resided in an apartment (the "Apartment") on the first floor of a two-story, two-building apartment complex located at the end of a cul-de-sac.  The apartment complex's parking lot was sandwiched between the two buildings and was bordered on its third-side by a large gapless fence standing in front of an approximately thirty-foot tall bluff. Seven LMPD officers, including Detective Butcher, approached the vehicle as it pulled into the parking spot directly in front of the Apartment.[2]  The officers were visibly armed and wore bulletproof vests with "POLICE" emblazoned thereon over their plain clothes.  (*Id.* at 30.)  Detective Butcher's pistol was drawn and in a "low ready" position as he approached the vehicle.  Two unmarked police vehicles parked behind the Defendant's wife's vehicle and blocked the only point of egress from the apartment complex.

---

[2] Witnesses for the Government testified that LMPD officers intentionally intercepted the Defendant outside of the Apartment because a preliminary background check revealed he owned several firearms and the officers wanted to prevent him from having access to firearms at the time they executed the First Search Warrant.

Officers instructed the Defendant and his family to exit the vehicle. (*Id.*) After LMPD officers conducted an initial protective sweep of the Apartment, the Defendant's wife and her son were allowed to enter and the officers' search of the Apartment began in earnest. At the same time, an officer motioned for the Defendant to walk towards the fence at the back of the parking lot. (*Id.*) The Defendant complied and was followed closely behind by two LMPD officers as he walked approximately twenty-five feet away from the entrance to the Apartment towards the fence. (*Id.*) When the Defendant reached the fence, the two tailing officers stopped and stood watch a few feet away, interposed directly between the Defendant and the Apartment, the vehicles, and the apartment complex's exit.[3]

Approximately five minutes after the Defendant first arrived at the fence, Detective Butcher approached the Defendant, handed him a copy of the First Search Warrant, patted him down, seized the cell phone on his person (the "Cell Phone") pursuant to the First Search Warrant, and engaged in a short dialogue about the purpose of the search. (*See id.* at 23, 30; ECF No. 48-1, at 3-7.) During this initial conversation, Detective Butcher told the Defendant that he was not under arrest and was not obligated to speak with Detective Butcher. He did not tell the Defendant that he could leave. (ECF No. 48-1, at 4.) Detective Butcher then returned to the Apartment to assist in the search. The Defendant, however, remained standing in front of the parking lot fence with the two LMPD officers in a "triangle" formation for another fifty-five to eighty-five minutes during the search of the Apartment. Detective Butcher returning intermittently to interact with the

---

[3] Detective Butcher testified that, as the lead detective, he instructed Detective Matthew Lee and the other officer at the pre-execution operations planning meeting to remain with and monitor the Defendant during the execution of the First Search Warrant. No officers were stationed directly outside the entrance to the Defendant's apartment or vehicles to prevent interference with the searches thereof.

Defendant. (ECF No. 40-2, at 30.)

Shortly after Detective Butcher had his first conversation with the Defendant, Detective Butcher returned to the Defendant's location by the fence and struck up another conversation. (*See id.* at 23; ECF No. 48-1, at 12-15.) Detective Butcher reiterated that the Defendant was not under arrest and was not obligated to speak with Detective Butcher and inquired whether the Defendant had any questions. (ECF No. 48-1, at 12.) The Defendant remarked that the officers' manner of approach and the search process itself had made him nervous and that he wanted to speak with a lawyer because he was unsure of his rights. (*Id.* at 12-13; ECF No. 40-2, at 23.) In response, Detective Butcher said he was only obligated to inform the Defendant of his rights when he provided a "custodial statement" but that the Defendant had the "right" to provide a "noncustodial statement" if he desired. (ECF No. 48-1, at 13.) Further, Detective Butcher asked the Defendant if he was worried whether child pornography would be found on the Cell Phone or otherwise. (*Id.* at 14; ECF No. 40-2, at 23.) The Defendant replied that he was not concerned about child pornography being discovered, but rather was agitated by what he originally perceived as the seizure of his firearms and any ramifications the search may have for his wife's employment. (ECF No. 40-2, at 23; ECF No. 48-1, at 14-15.) Detective Butcher stated he was not there "to jam up anybody," asked the Defendant to "hold tight," and returned to the Apartment to continue the search. (ECF No. 48-1, at 15.) Again, the Defendant was not told he was free to leave.

Approximately thirty or forty-five minutes after the Defendant first arrived at the fence, Detective Butcher again returned to the Defendant's location and engaged him in another conversation. (*See id.* at 16-21; ECF No. 40-2, at 23-24.) The sun was setting, the lighting in the parking lot was poor, and the evening was chilly. (*See* ECF No. 40-2, at 30.) Detective Butcher stated that he would be seeking a second search warrant to examine the contents of the Cell Phone after

completing the search of the premises. (ECF No. 48-1, at 16.) Detective Butcher further explained that, unless the Defendant was willing to provide the Cell Phone's passkey, the Cell Phone would likely need to be sent to the "FBI crime lab" in Virginia to be unlocked prior to examination. (*Id.* at 16-18.) The Defendant expressed that he had no doubts that the FBI would be able to unlock the Cell Phone but requested further clarification of the process by which its contents would be examined. (*Id.* at 16-19.) After Detective Butcher provided such clarification, the Defendant agreed to provide the passkey and walked Detective Butcher through the process of unlocking the Cell Phone.[4] (*Id.* at 18-20.) Once Detective Butcher made a record of the passkey, he asked the Defendant to "[g]ive [him a] couple more minutes" and returned to the Apartment. (*Id.* at 20-21.)

Detective Butcher subsequently returned to speak with the Defendant and asked for guidance in accessing various safes and other secured items located within the Apartment, which the Defendant provided without issue. (*Id.* at 23-25.) Detective Butcher next returned to question the Defendant as to whether he had ever taken any pictures of nude children or possessed anything that could be classified as child pornography, which the Defendant denied. (ECF No. 40-2, at 24; ECF No. 48-1, at 26-27.) Detective Butcher later returned for further assistance in accessing the Defendant's secured items, eventually having the

---

[4] (*See* ECF No. 48-1, at 19 (Det. Butcher: "So would you like to provide the pass code for your phone?"
Defendant: "Sure."
Det. Butcher: "What is it?"
Defendant: "Uh, I – it's – it's a – it's a drawing pattern."
Det. Butcher: "Oh, it's a drawing?"
Defendant: "Yeah."
Det. Butcher: "So diagonal – so diagonal –"
Defendant: "Yeah. Go ahead and lock it."
Det. Butcher: "Let me see if I -- do you mind if I try to do it?"
Defendant: "Sure. Swipe it – no, just swipe it once.").)

1  Defendant enter the Apartment itself and physically assist the officers in their
2  efforts. (ECF No. 40-2, at 24; ECF No. 48-1, at 28-39.) Notably, after the officers
3  completed their search of the Apartment and were preparing to search the
4  Defendant's vehicles, the Defendant requested that Detective Butcher access the
5  Cell Phone and provide the Defendant with the phone numbers of several of his
6  coworkers in the event he needed to contact them before the Cell Phone was
7  returned to him. (ECF No. 40-2, at 24; ECF No. 48-1, at 41-44.) The search of
8  the Defendant's and his wife's vehicles occurred without incident and LMPD
9  officers left shortly thereafter.

## II. DISCUSSION

The Defendant moves to suppress any and all statements he made during the execution of the First Search Warrant on March 15, 2018, arguing that his statements were made without the notice of rights mandated by *Miranda v. Arizona*, 384 U.S. 436 (1966) and were involuntary.[5] (ECF No. 40-1, at 16-25.) The Defendant also seeks suppression of any evidence derived from his statements, including the passkey to and contents of the Cell Phone. (*Id.* at 23.) The Government opposes suppression, arguing the Defendant's statements were voluntary and that *Miranda*'s warnings were not triggered because the Defendant's statements were not the product of custodial interrogation. (ECF No. 48, at 7-14.)

"Prior to *Miranda*, the admissibility of an accused's in-custody statements

---

[5] The Defendant also moved to suppress any and all statements made in connection with his subsequent arrest on March 22, 2018, based upon violations of *Miranda* and its progeny. (ECF No. 40-1, at 25.) In its response and at the evidentiary hearing, however, the Government represented that "the Court need not reach the merits of the Defendant's motion to suppress regarding his post-arrest interview [on March 22, 2018] as the [Government] will not be using [those] statements in its case-in-chief or in rebuttal at trial." (ECF No. 48, at 7.) Based upon the Government's representations, the Court agrees that the Defendant's motion to suppress his March 22, 2018 statements should be denied as moot.

was judged solely by whether they were 'voluntary' within the meaning of the Due Process Clause." *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (citations omitted). Under this voluntariness standard, the Court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession" such that "his capacity for self-determination [was] critically impaired." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (internal quotations and citations omitted); *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (internal quotations and citations omitted); *cf. United States v. Preston*, 751 F.3d 1008, 1026 (9th Cir. 2014) ("[T]he Supreme Court has observed that the test of voluntariness is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." (internal quotations omitted) (citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976); and *Bram v. United States*, 168 U.S. 532, 542–43 (1897))). "The due process [voluntariness] test takes into consideration the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation . . . . [and] depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Dickerson*, 530 U.S. at 434 (internal quotations, citations, and alterations omitted); *see also Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (relevant circumstances include "police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; . . . mental health . . . . [and] the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation"); *Preston*, 751 F.3d at 1017 ("[T]here is no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." Because there is no single controlling criterion, no single factor, such as length of interrogation, can be dispositive." (internal quotations omitted) (citing *Schneckloth*, 412 U.S. at 224)). "If a suspect's statements had been obtained by techniques

7

3:18-cr-02658-BTM

and methods offensive to due process or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will, the statements would not be admitted." *Elstad*, 470 U.S. at 304. Indeed, the Supreme Court has held that "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ." *Mincey v. Arizona,* 437 U.S. 385, 398 (1978) (citations omitted) (emphasis original).

"[C]onclud[ing] that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself," however, "the Supreme Court [in *Miranda*] adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations."[6] *Dickerson*, 530 U.S. at 435 (internal quotations, citations, and alterations omitted); *see also United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) ("An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is in custody." (internal quotations and citations omitted)). These *Miranda* protections complement, rather than supplant, the voluntariness

---

[6] "As for the procedural safeguards to be employed, . . . the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda*, 384 U.S. at 444–45.

analysis. *See DeWeaver v. Runnels*, 556 F.3d 995, 1002–03 (9th Cir. 2009) ("A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary." (citing *Dickerson*, 530 U.S. at 434)). Indeed, "the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." *United States v. Patane*, 542 U.S. 630, 639 (2004); *see also Elstad*, 470 U.S. at 304 ("*Miranda* require[s] suppression of many statements that would have been admissible under traditional due process analysis by presuming that statements made while in custody and without adequate warnings were protected by the Fifth Amendment."). Because *Miranda*'s presumption of coercion "sweeps beyond the actual protections" of the Fifth Amendment, however, "statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, though the fruits of actually compelled testimony cannot." *Patane*, 542 U.S. at 639 (citations omitted); *cf. New Jersey v. Portash*, 440 U.S. 450, 459 (1979) ("[A] defendant's compelled statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in a criminal trial."). While the Defendant bears the burden of establishing he was subject to custodial interrogation, *see United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) (citing *United States v. Crocker*, 510 F.2d 1129 (10th Cir. 1975)), the Government bears the burden of demonstrating the voluntariness of the Defendant's statements and the admissibility of any evidence it seeks to introduce at trial. *Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004).

As an initial matter, the Court concludes that Detective Butcher's interactions with the Defendant on March 15, 2018 constituted "interrogation" for the purposes of *Miranda*. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

9
3:18-cr-02658-BTM

reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also id.* at n.5 ("By 'incriminating response' we refer to any response – whether inculpatory or exculpatory – that the *prosecution* may seek to introduce at trial." (emphasis original)). Detective Butcher engaged in express questioning of the Defendant that directly invited incriminating response from him. Indeed, immediately after the Defendant expressed interest in speaking with an attorney about his rights during his second dialogue with Detective Butcher, Detective Butcher inquired whether the Defendant was concerned the search would reveal evidence of possession of child pornography, the same crime which formed the basis for the First Search Warrant. Further, in his third dialogue with the Defendant, Detective Butcher inquired whether the Defendant knew the passkey to the Cell Phone, the answer to which could be used to demonstrate the Defendant's ownership, control, or access to the Cell Phone. In a later dialogue, Detective Butcher again expressly inquired as to the Defendant's creation or possession of child pornography. Given the manifest purpose of these inquiries and the fact that they could elicit an incriminating response, the questioning was clearly "interrogation" under *Miranda*.

The Court also holds that the Defendant was "in custody" during Detective Butcher's aforementioned interrogations. "In cases such as this in which the suspect has not formally been taken into police custody, a suspect is nevertheless considered 'in custody' for purposes of *Miranda* if the suspect has been 'deprived of his freedom of action in any significant way.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (quoting *Miranda*, 384 U.S. at 444). "To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation . . . . [and] then ask whether a reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); citing *Berkemer v. McCarty*, 468 U.S. 420, 442

& n.35 (1984)). "The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." *Kim*, 292 F.3d at 973 (citing *Stansbury v. California*, 511 U.S. 318, 323 (1994)). Relevant circumstances include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted). In *United States v. Craighead*, the Ninth Circuit noted that relevant circumstances also include: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Craighead*, 539 F.3d at 1084; *see also Kim*, 292 F.3d at 974 (relevant factors include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." (citations omitted)).

Here, the Defendant and his family were confronted by seven armed officers wearing bulletproof vests, at least one of which had his firearm drawn and ready, as they parked their vehicle outside of their residence. The officers parked their own vehicles at the entry to the parking lot, thereby preventing any other vehicles from entering or exiting. The officers went on to isolate the Defendant from his family and others and placed him under the steadfast watch of two visibly-armed officers at the back of a parking lot for approximately an hour to an hour and a half while five other officers searched the Apartment. For the duration of his segregation, the two officers stood as sentinels between the Defendant and the sole exit to the premises. The sun set during this time and it was a chilly, mid-

March evening for which the Defendant was insufficiently dressed. The Defendant did not have an opportunity to see or speak with his wife or stepchild during the search of the Apartment. (*See* ECF No. 40-2, at 30.) While the Defendant was told that he was not under arrest and was not obligated to answer Detective Butcher's inquiries, the Defendant was never told that he could leave the area or was otherwise "free to go." The Defendant testified that, other than his initial pat down, no officer put their hands on him or otherwise physically coerced or restrained his actions, but that the officers' body language indicated he was not allowed to move away from the fence or otherwise leave the immediate area. Indeed, when asked whether he would have allowed the Defendant to leave the premises if he had asked to do so, one of the officers assigned to watch the Defendant, Detective Matthew Lee, testified he would have contacted Detective Butcher to ask whether the Defendant was allowed to leave. Moreover, Detective Butcher ended at least his second and third dialogues with the Defendant with phrases that implied he was not to leave. (*See* ECF No. 48-1, at 15 ("hold tight"), 21 ("Give me couple more minutes").) The officers who stood watch and Detective Butcher also deferred acting on the Defendant's requests to obtain comforting items from his residence and vehicles, namely warm clothing and cigarettes, although Detective Lee eventually requested another officer to obtain such items for the Defendant. (*See* ECF No. 40-2, at 30-31; ECF No. 48-1, at 5-7, 15.) And while Detective Butcher's questioning could hardly be described as coercive, it did include inquiries designed to elicit incriminating responses from the Defendant relevant to the purposes of the search and eventual prosecution. In all, from the time LMPD officers first approached the Defendant in his wife's vehicle until the time they concluded their search and vacated the premises on March 15, 2018, approximately one-and-a-half to two hours elapsed. (*See* ECF No. 40-2, at 31.)

Taking these circumstances in combination, the Court concludes that the Defendant was held in a "police-dominated atmosphere" that a reasonable person

would not have felt at liberty to terminate and thus was "in custody" for the purposes of *Miranda*. *See Craighead*, 539 F.3d at 1084-90 (suspect in custody for purposes of *Miranda* where eight armed officers entered the defendant's home and confined him to back storage room with an officer blocking the exit from the room, despite having told suspect he was "free to leave"); *Kim*, 292 F.3d at 973-78 (suspect in custody where officers surrounded her in locked store, separated her from her husband and restricted her communications with her son, told her when and where she could sit, and asked her questions that could result in incriminating response for approximately fifty minutes); *United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (suspect in custody where he was "questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house.").

Given the Court's conclusion that the Defendant was subjected to custodial interrogation and the undisputed fact that the Defendant was never provided the notice of rights required by *Miranda*, the Court holds there was a *Miranda* violation on March 15, 2018. Before turning to the ramifications of such holding, however, the Court must determine whether the Defendant's challenged statements were involuntary in fact. In doing so, the Court is cognizant that such determination "requires more than a mere color-matching of cases. It requires careful evaluation of all the circumstances of the interrogation." *Mincey*, 437 U.S. at 401 (internal quotations and citations omitted); *see also Brown v. Illinois*, 422 U.S. 590, 603 (1975) ("The question whether a confession is the product of a free will . . . must be answered on the facts of each case. No single fact is dispositive."). Further, the "Court[ ] must weigh, rather than simply list, the relevant circumstances, and weigh them not in the abstract but against the power of resistance of the person confessing." *Preston*, 751 F.3d at 1017 (internal quotations and citations omitted)).

The Defendant was approximately thirty-five years old during the execution of the First Search Warrant. Other than the apprehension generally attendant to

13

3:18-cr-02658-BTM

1  being approached by armed law enforcement officers and their searching of a
2  suspect's residence for evidence, there is no indication that the Defendant suffered
3  any cognitive impairments or intellectual disabilities or was otherwise inherently
4  susceptible to persuasion or unable to resist questioning.  While the Defendant
5  was not informed of his rights as required by *Miranda*, Detective Butcher informed
6  the Defendant several times that he was not under arrest and was not obligated to
7  speak with Detective Butcher and never pled with or otherwise badgered the
8  Defendant to respond.  And while the record reflects that the Defendant may have
9  had a few fleeting conversations with other LMPD officers, this is not a situation
10 where multiple interrogators were serving in relay and bombarding the Defendant
11 with incriminating inquiries.  Indeed, a review of the audio recordings and
12 transcripts of Detective Butcher's interactions with the Defendant reveal courteous,
13 professional, and even affable questioning and conversation by and between the
14 Defendant, Detective Butcher and other LMPD officers.  While the Defendant's
15 segregation lasted for approximately ninety minutes, his intermittent interrogations
16 were relatively short and there is no evidence of physical abuse, trickery, deceit,
17 promises, or other improper mental coercion of the Defendant.  Indeed, Detective
18 Butcher was truthful when he represented to the Defendant that the involvement
19 of the FBI would likely be necessary to unlock the Cell Phone if the Defendant did
20 not provide its passkey and generally provided informative and cogent responses
21 to the Defendant's various requests for information.  Further, the Defendant was
22 provided with and reviewed a copy of the First Search Warrant before Detective
23 Butcher's questioning and the contents of the warrant apprised the Defendant of
24 the underlying objectives of the search and the officers' inquiries.  And while the
25 Defendant was separated from his family and others, his questioning was not
26 totally hidden from public view in the confines of a police station or otherwise.
27 Moreover, the Defendant himself attests that he disclosed the Cell Phone's
28 passkey at least in part upon his own risk analysis.  (*See* ECF No. 40-2, at 31 ("I

14
3:18-cr-02658-BTM

thought that giving the [passkey] would allow the investigation to stay with La Mesa Police Department and not escalate it into a more serious case. . . . I thought providing the [passkey] would appease Detective Butcher and prevent the search of the home, where my wife and stepson were, from becoming hostile or taking even longer."). Finally, the Defendant himself requested that Detective Butcher unlock and access the Cell Phone for the Defendant's own benefit, seeking to obtain contact information for coworkers located on the Cell Phone that had already been seized.

In light of the totality of these circumstances and those identified in the *Miranda* "in custody" analysis, *supra*, the Court holds that the statements at issue were not obtained "by physical or psychological coercion or by improper inducement [such] that the suspect's will was overborne." *See United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) (internal quotations and citations omitted). Simply put, while the Defendant was subjected to a police-dominated atmosphere, there is no indication that his statements therein were the product of any coercive influence. Accordingly, the Court concludes that the Defendant's March 15, 2018 statements were voluntary in nature.

Having concluded the Defendant's March 15, 2018 statements were voluntary despite the *Miranda* violation, the Court must delineate the effect of such holdings. As previously stated, "statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, though the fruits of actually compelled testimony cannot." *Patane*, 542 U.S. at 639 (citations omitted); Elstad, 470 U.S. at 307 ("Despite the fact that patently voluntary statements taken in violation of Miranda must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination." (citations omitted)). Nevertheless, the Defendant argues that "[a]s a result of the *Miranda* violation, the Court should suppress all statements made by [the Defendant], including [the Cell Phone's

passkey], and any evidence derived from his statements, including the contents of the [Cell Phone]." (ECF No. 40-1, at 23 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). But "the *Miranda* rule does not require that the statements taken without complying with the rule and their fruits be discarded as inherently tainted." *Patane*, 542 U.S. at 639; *see also id.* at 640 ("[N]othing in *Dickerson*, including its characterization of *Miranda* as announcing a constitutional rule, changes any of these observations." (citing *Dickerson*, 530 U.S. at 444)). Rather, "the exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation." *Id.* at 641–42 (internal quotations, citations, and alterations omitted). "Thus, unlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self–Incrimination Clause, there is, with respect to mere failures to warn, . . . . no reason to apply the 'fruit of the poisonous tree' doctrine of *Wong Sun*." *Patane*, 542 U.S. at 642; *see also Elstad*, 470 U.S. at 307 n.1 ("[A] simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment."). Accordingly, while the Defendant's March 15, 2018 statements, including his disclosure of the Cell Phone's passkey, cannot be used at trial in the Government's case-in-chief, the Court concludes that such statements can be used for impeachment. *See Patane*, 542 U.S. at 639; *Portash*, 440 U.S. at 459. Further, the *Miranda* violation alone does not require the suppression of the fruits of the Defendant's unwarned statements, including but not limited to the contents of the Cell Phone.[7] *See Tucker*, 417 U.S. 433 (failure to provide *Miranda* warnings before suspect's otherwise voluntary statements did

---

[7] To the extent that the Cell Phone's contents can be categorized as "nontestimonial" in nature, this categorization provides another rationale for denying suppression. *See Patane*, 542 U.S. at 637 ("The [Fifth Amendment's Self-Incrimination] Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." (citing *United States v. Hubbell*, 530 U.S. 27, 34 (2000)).

not require suppression of testimony of witness whose identity was discovered as a result of suspect's unwarned statements).

### III.  CONCLUSION

Based upon the foregoing, the Defendant's motion to suppress his March 15, 2018 statements (ECF No. 40-1, at 16-25) is **GRANTED IN PART** and **DENIED IN PART**.  Because the Defendant's March 15, 2018 statements were made during custodial interrogation but without the warnings mandated by *Miranda*, they may not be introduced at trial during the Government's case-in-chief.  Because such statements were otherwise voluntary, however, they may be used by the Government where appropriate to impeach the Defendant.  Further, because no constitutional violation has been found, the evidence derived from the Defendant's March 15, 2018 statements, including the contents of the Cell Phone, need not be suppressed based on a violation of *Miranda*.  Further, based upon the Government's representations that it will not introduce the Defendant's March 22, 2018 statements at trial, the Defendant's motion to suppress his March 22, 2018 statements (ECF No. 40-1, at 25) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated: October 24, 2019

_____
Honorable Barry Ted Moskowitz
United States District Judge